**Birl JOHNSON, Plaintiff-Respondent,**

v.

**John W. PRESLEY, d/b/a Security Trucking Company, Defendant-Appellant.**

No. 46740.

Supreme Court of Missouri,

Division No. 1.

Jan. 12, 1959.

Motion for Rehearing or to Transfer to Court en Banc Denied Feb. 9, 1959.

Seiler, Blanchard & Van Fleet, Joplin, for appellant.

Moore, Pettit & Steinle, J. Hal Moore, Walter S. Pettit, Jr., Jack P. Steinle, Aurora, for respondent.

DALTON, Judge.

Action for damages for personal injuries sustained in a motor vehicle collision. Verdict and judgment were for plaintiff for $75,000. Defendant has appealed.

Error is first assigned on the trial court's overruling of defendant's motion for a directed verdict presented at the close of all the evidence. It is contended that the plaintiff failed to make a submissible case upon the sole issue on which the cause was submitted to the jury, to wit, defendant's humanitarian negligence in failing to stop his tractor-trailer truck and avoid injuring the plaintiff. We shall state the evidence favorable to plaintiff and disregard defendant's evidence unless it aids the plaintiff's case. We shall keep in mind, however, that plaintiff is bound by his own personal testimony and his own theory of the case.

The collision occurred before daylight, about 6:15 a. m., December 14, 1954 in Lawrence County near the Hoberg Junction, west of Mt. Vernon on U. S. Highway No. 166, where Lawrence County Highway "HH" intersects U. S. Highway No. 166 on its south side. The intersection, referred to as a "T", is on the outer perimeter of a curve in the main highway. There is an overpass over a railroad a short distance east of the intersection. Plaintiff was driving a tow bar unit, two Chevrolet automobiles together, one car being towed by the other, west on the main highway at 45 to 50 miles per hour.

Where, when and how plaintiff came into a position of imminent peril of defendant's truck is of vital importance. The evidence shows that, as plaintiff proceeded west from Mt. Vernon, he had noticed an automobile some two or three hundred yards ahead of him, moving in the same direction (a Pontiac Sedan, referred to as the Falmer car). Plaintiff lost sight of this car as he was going up a hill from the Spring River bridge to the overpass. The car ahead had already crossed the overpass. When plaintiff rounded the bend in the overpass and was about half way across it, he saw the red tail light of this preceding automobile which had stopped in front of him on the north side of the main highway in the westbound traffic lane, opposite the center of the "T" intersection ("right up even, just about where anybody would make a left turn."). The driver was apparently intending to turn left and was waiting for two eastbound trucks to pass. When plaintiff saw the extra bright tail light on the car ahead, he also saw the light of the approaching trucks. The second of these trucks was defendant's tractor-trailer truck which was then approaching from the west at 50 miles per hour. On direct examination, plaintiff first said he was about 100 feet to the rear of the Falmer car, which had stopped in the intersection, when he noticed that it had stopped. He later said: "Well, I might have been a little farther from the Falmer car when I first discovered it." Plaintiff also said: "I saw his light was red, and I knowed he was stopped. * * * The reason I applied my brakes was because the vehicle in front of me was stopped." Plaintiff was then driving 40 to 50 miles per hour. It wasn't safe to drive without car lights and all headlights were on.

When plaintiff realized that the car ahead had stopped at the intersection and he saw defendant's truck approaching, he knew

that he did not have time to pass around to the left of the parked car with his tow bar unit, but he said he could have passed safely if he had had only one automobile. To avoid a collision with the automobile which had stopped in front of him in his traffic lane, plaintiff hit his brakes so fast that the back car of the tow bar unit shoved the front car (operated by plaintiff) forward, causing it to jackknife and go over into the eastbound traffic lane, where it stopped, blocking the eastbound traffic lane.

Plaintiff further said that he saw the Falmer car ahead of him, "when I rounded the bend in the bridge," and was a little over half way across the overpass. He also said: "When I rounded the bend then I saw his light was red, and I know he was stopped, because he had to have his foot on the brake for the light to be red, as it was when I came around the bend." The record also shows the following questions and answers:

"Q. Never tried to slow down any time until you were about the middle of the overpass and saw this car sitting up there in the middle of the intersection and the truck coming from the other direction? A. Yes, sir. * * *

"Q. Well, even where you were, you had plenty of time to stop if you hadn't got thrown over on the left side of the road when you did try to stop? A. Well, you take coming around that bend and seeing him, and traveling, you are not standing still, you are still traveling when you see him and you have got to put your foot on the brake."

Plaintiff said he traveled about 100 feet after he applied his brakes and before the actual collision occurred. He also said his car traveled some distance straight west, he could not say how far, before it veered to the left. His car stopped east of the intersection and was not obstructing any part of Lawrence County Highway "HH". Plaintiff said his car may have come to a stop 50 to 100 feet behind the Falmer car, but he didn't think so. He didn't strike or come close to the Falmer car and didn't intend to. "I stopped before I hit him, all right." The weaving back and forth of the towed car had caused the front car to jackknife to the left side of the highway.

Within an estimated two or three seconds after plaintiff's car had stopped, it was struck by defendant's eastbound truck. The car and colliding truck came to a stop, after the collision, at the ninth post of the guard rail (west of the overpass) on the south shoulder of the highway, 96 feet west of the west edge of the overpass. The actual collision had occurred some 43 feet farther west. Plaintiff estimated that defendant's truck was 300 to 350 feet away at three different times: (1) when he first noticed that the car in front of him had stopped; (2) when his tow bar unit "had started to jackknife and gone" onto the left side of the road; and (3) after his car was stopped on the south side of the road. He later stood on the last statement. He also estimated that the truck was 600 feet away *from him,* and "was coming around the curve up west from west of the Hoberg Junction," when he first applied his brakes behind the Falmer car. He further said the truck was 600 feet or more *from the Falmer car,* when he applied his brakes. He also said that defendant's truck was fairly close to the Falmer car and so close that he knew he could not pass around it, so he attempted to stop. He further said these estimates were "just estimates" under the circumstances he was in as it "would be impossible to say just exactly."

The record further shows:

"Q. So this truck was fairly close to the Falmer car? A. Yes.

"Q. And what do you mean by 'close' to it? A. Well, you take driving like that, you are moving and the object is moving coming toward you, and with experience you have some kind of judgment to know wheth-

er you can go around safely; and if I had been driving a single car I could have made it, but it would have been impossible to take a double car around this pick-up, or whatever vehicle was in front of me, and get on my side of the road safely. * * *

"Q. And what you saw was the lights coming toward you? A. Yes, sir.

"Q. On this truck? A. Yes, sir.

"Q. And what you are saying is that in that situation you don't have any real judgment about distance, about actually how far, any real estimate? A. Well, that would be almost impossible to get out a real estimate; just to maybe say fifty foot, you couldn't hardly say it was fifty foot, because you really don't know.

"Q. That is what you are saying that you really don't know where it was? A. I know where it was, but I mean I couldn't say how many feet it was.

"Q. That's what I mean. You know it was coming toward you? A. Yes.

"Q. And coming towards this stopped car? A. Yes, sir."

Plaintiff said he did not personally know the speed of defendant's truck, nor where the vehicles came to rest after the collision.

The traveled portion of the main highway was 22 feet wide and it was paved with asphalt. The shoulders were 7 feet 8 inches wide and graveled. The mentioned overpass was 171 feet and 3 inches in length and its inside width was 26 feet. Near the center of the intersection and on the north side of Highway No. 166, there was an arrow marker bearing the word "Hoberg." Plaintiff's witness (Sergeant Bruner) fixed the distance from the east edge of the overpass to the Hoberg arrow as 360 feet which, less the width of the overpass, would leave 188 feet and 9 inches as the

distance from the overpass to the arrow at the center of the intersection. Plaintiff testified that he didn't think it was 200 feet from the center of the intersection to the west end of the overpass, although it might be. Plaintiff's witness Bruner, also said that it was 96 feet from the burned 9th post, where the car and truck came to rest, to the west edge of the overpass. The record further shows:

"Was it eight of those sections? A. It was eight sections; ninety-six feet.

"Q. Ninety-six feet? A. Yes.

"Q. As a matter of fact did you also, at my request, measure the distance from this ninth post westward to a point across from the Hoberg arrow, or sign, being the approximate center of the intersecting HH road? A. Yes, sir.

"Q. And I will ask you if you can testify what that distance was? A. Two hundred and five feet."

This testimony indicates a total of 301 feet from the west edge of the overpass to the Hoberg arrow, and directly conflicts with the witness' prior testimony that it was 360 feet from the east edge of the overpass to the Hoberg arrow and that the overpass was 171 feet and 3 inches, leaving 188 feet and 9 inches as the distance between the overpass and the arrow.

Appellant has filed the affidavit of witness Bruner stating that the mentioned 205 feet is an incorrect measurement; that either he misunderstood the question, or gave the wrong measurement in response to the question; that he had re-visited the scene and re-measured; and that the 205 foot measurement is erroneous. We need not consider this affidavit, in view of plaintiff's own testimony that the distance was less than 200 feet. The photographic evidence further shows that there are less than 16 of the 12 foot spaces (between the several guard rail posts) between the Hoberg sign and the overpass, or less than 192 feet. This evidence shows the witness'

testimony indicating approximately 205 feet between the Hoberg sign and the 9th guard rail post and making 301 feet (96 and 205) between the overpass and the center of the intersection to be an error.

County road "HH" flares out as it joins the main highway and plaintiff's witnesses fixed the width of the intersection at 120 feet at the edge of the main highway and at 162 feet where the traffic actually entered upon the asphalt pavement of U. S. Highway No. 166. The intersection was also paved with asphalt, with some gravel scattered over the asphalt near the center of the intersection, but not in the traffic lanes turning into Highway No. 166. Defendant's tractor and trailer weighed approximately 17,000 pounds and was 43 feet long. The trailer, referred to as a single axle trailer, had a flat bed and was empty. The brakes of both tractor and trailer were in good condition.

Defendant's truck left 123 feet of skid marks on the pavement, with no breaks in the marks, however, there was a jog in the marks 39 feet back of the rear end of the trailer. The skid marks were made by the rear wheels of the trailer. The evidence indicated that the collision had happened 43 feet east of the jog, when the front of the truck was near where the back end of the trailer came to rest. The middle of the cab of defendant's truck, still headed east, stopped 72 feet east of the east edge of the intersection at the 9th post, referred to as being 96 feet west from the west edge of the overpass. These figures indicate that it was 168 feet from the east edge of the intersection to the west side of the overpass.

Plaintiff's witness Falmer testified that, when plaintiff's car jackknifed and started across the eastbound traffic lane it was 100 to 150 feet to the east, behind him, and that defendant's truck was then 100 feet to the west. Falmer undertook to get out of the way of the impending crash and the rear of his car was about even with the Hoberg sign when the collision occurred. The witness further said that plaintiff's car had reached the south edge of the main highway before the impact, but that it had not stopped. Defendant's truck also veered to the south side of the highway and the impact was 20 to 30 feet west from where the vehicles came to rest at the burned post. This post, as stated, was 72 feet east of the east edge of the intersection. Falmer further fixed the speed of defendant's truck at 50 miles per hour. Plaintiff offered in evidence the truck driver's admission that he was driving the truck at 50 miles per hour when plaintiff jackknifed in front of him. On cross-examination, defendant's truck driver fixed the speed of his truck at 45 to 50 miles per hour.

Plaintiff's expert witnesses fixed the stopping distances for defendant's truck, when traveling at 50 miles per hour, at 175 to 180 feet and from 10 to 15 feet less at 45 miles per hour, both estimates including reaction time.

Plaintiff sustained severe and permanent injuries in the collision and also in the resulting fire, prior to being removed from his wrecked automobile. In view of the conclusions we have reached, it will be unnecessary to review the evidence concerning his injuries.

■ In support of the contention that no case was made for the jury, appellant first contends that "there was no substantial, probative evidence that defendant, after notice of plaintiff's imminent peril, could have averted the collision with the means at hand." Appellant's contention is in part based upon the proposition that plaintiff's own testimony as to the location of defendant's truck, when plaintiff came into a position of imminent peril of being struck by defendant's truck, was so conflicting, contradictory and uncertain as to show, as a matter of law, that his testimony was merely a guess and amounted to no more than speculation and conjecture. Appellant reviews plaintiff's conflicting statements on this issue at some length and then insists that "plaintiff's counsel made

absolutely no effort to rehabilitate plaintiff, or to explain these glaring contradictions in his testimony on this most vital element of his case." Appellant insists that the jury should not be allowed to speculate and guess which of the several statements are correct. Appellant cites Stephens v. Thompson, Mo.Sup., 293 S.W. 2d 392, 394; Kiger v. Terminal R. Ass'n of St. Louis, Mo.Sup., 311 S.W.2d 5, 14; Sammons v. Kansas City Public Service Co., Mo.App., 179 S.W.2d 620, 624, 153 A.L.R. 215. Appellant also says that "* * * it seems apparent from the very discrepancies in plaintiff's testimony that the judgment gained by plaintiff in the few seconds that elapsed from the time plaintiff saw the situation confronting him and came into collision with defendant's oncoming tractor-trailer unit cannot be considered as reliable, and allowing the jury to predicate a verdict on such testimony could only call for speculation and conjecture. Guyer v. Missouri Pacific R. Co., 174 Mo. 344, 73 S.W. 584, 586; Breshears v. Myers, Mo.Sup., 266 S.W.2d 638, 640." We think the credibility, weight and value of plaintiff's testimony as to the location of defendant's truck when plaintiff entered the eastbound traffic lane and came into a position of imminent peril from the truck was for the jury. The record in this case is not such that we may say as a matter of law that plaintiff's testimony as to the distances stated was inherently unbelievable or without probative value. The conflicts mentioned were for the jury. The several circumstances stated and the distances testified to were sufficient to make out a case for plaintiff. The distances were all in excess of the stopping distances testified to by the expert witnesses and other evidence shows that the truck driver's view of the place where plaintiff's car crossed the center line and stopped was unobstructed.

■ Appellant further contends that no case was made for the jury because "the testimony adduced by plaintiff as to stopping distances was in conflict with the established physical facts and cannot be accepted as a basis for verdict." Appellant's argument proceeds as follows: "* * * plaintiff's own evidence shows defendant got his brakes applied and skidded 123 feet, during the course of said skid the tractor-trailer collided with plaintiff's car and then continued its skid east for 25 to 30 feet. The physical facts, introduced in evidence by plaintiff, show uncontrovertedly that defendant could not and would not have stopped at 172.5 feet (123 feet of skid marks plus ¾ second reaction time), except for the collision with plaintiff's car, after defendant saw the danger and got on his brakes. Here the physical facts established by plaintiff conflict with the expert testimony, and under such a state of facts the expert testimony cannot be accepted as a basis of verdict. Freed v. Mason, Mo.App., 137 S.W.2d 673, 678; Atchison, Topeka & Santa Fe Railway Co. v. Hamilton Bros., 8 Cir., 192 F.2d 817. Or else defendant, in fact, was traveling faster than 45 or 50 miles per hour, and plaintiff offered no evidence of stopping distances for speeds in excess of 50 miles per hour."

We find no merit in this contention. The evidence shows that the skid marks were made only by the tires of the trailer and that only the trailer wheels slid. Only defendant's witness testified that all brakes were immediately applied, while plaintiff's witnesses said that all brakes on the tractor and trailer could have been safely applied at the same time. Plaintiff's evidence also indicates that the brakes should have been applied earlier.

■ Appellant's final contention on the issue of submissibility is that plaintiff failed to sustain the burden of proof on the distance defendant's truck could have been stopped under the circumstances that existed at the scene of the collision, this on the theory that there was loose gravel on the highway at the time of the collision. The point is without merit. There was substantial evidence tending to show that there was not enough gravel on the high-

way to affect materially the stopping distance of defendant's truck. Other evidence shows the traveled part at the intersection was clear of gravel.

■ Appellant further assigns error on the giving of plaintiff's instruction No. 1. The criticised portion is as follows: "The Court instructs the jury that, if you find and believe from the evidence that at the time and place and before the collision mentioned in evidence the plaintiff was in a position of imminent peril, and further find from the evidence that by keeping a lookout Henry Armstrong could. or should have known that plaintiff was in such position of imminent peril, and that by such lookout Henry Armstrong could or should have so known of such imminent peril in time thereafter by the use of the highest degree of care in the use of the means at hand, and with reasonable safety to himself, his vehicle and others using the highway to have thereafter stopped his vehicle and by so doing the collision would have been avoided; and if you further find from the evidence that Henry Armstrong thereafter failed to exercise such care to so stop his vehicle * * *."

Appellant contends that "said instruction permits the jury to find against the defendant for failure to stop the truck based upon what the jury believes the truck driver could have discovered by a lookout and holds the truck driver to what he could or should have known by such lookout, thus imposing a higher duty upon him than that required by the statute, confusing the jury, and conflicting with instruction No. 4 defining 'highest degree of care.'" Appellant also contends that the instruction injects primary negligence into a humanitarian submission in that it " * * * permitted the jury * * * to take into consideration the acts or omissions of the defendant's truck driver prior to the time that plaintiff came into a position of imminent peril of *being struck by defendant's truck,* where the evidence showed that plaintiff was in imminent peril from sources and hazards other than defendant's truck

before he came into a position of imminent peril of being struck by defendant's truck * * *"; and that "it reached into defendant's primary duty and imposes the duty to defendant's truck driver to keep a lookout to discover plaintiff in imminent peril at all times before the collision and under it the jury was authorized to consider evidence adduced by plaintiff tending to establish antecedent negligence of excessive speed and failure to keep a lookout."

It is apparent that the instruction imposed an absolute duty to keep a lookout and to know what he could have known by such lookout and the duty is not limited to the exercise of the highest degree of care which the instruction subsequently applies to the use of the means at hand after the driver could or should have known of plaintiff's imminent peril. The defects in the instruction clearly appear by contrast with the allegations of plaintiff's petition wherein plaintiff alleged that defendant's truck driver, "Elmer Henry Armstrong saw, or, in the exercise of the highest degree of care, could have seen, defendant Sylvan Falmer suddenly check the speed and stop his motor vehicle in front of plaintiff's vehicle, and knew, or, in the exercise of the highest degree of care, should have known, that plaintiff would be compelled to suddenly stop or turn his vehicle in order to avoid a collision with defendant Sylvan Falmer's vehicle, and knew, or, in the exercise of the highest degree of care, could have known, that plaintiff was in a position of imminent peril and danger of injury in time thereafter, and with the means at hand, and with safety to himself and his vehicle and all other persons then using the highway, to have stopped his vehicle * * * and thereby have avoided the collision and plaintiff's injuries, but that he negligently and carelessly failed to do so."

We think the instruction clearly imposed upon defendant's truck driver a higher duty than that imposed by law. Toburen v. Carter, Mo.Sup., 273 S.W.2d 161, 165;

Welcome v. Braun, Mo.Sup., 319 S.W.2d 586. The duty imposed was not limited or fixed by reference to any standard of care, such as the exercise of the highest degree of care, which was applied only to action and use of the means at hand to stop the truck and not to keeping a lookout and knowing of plaintiff's imminent peril from defendant's approaching truck.

Respondent argues that there was only one collision and that "the liability of defendant was predicated upon only one negligent act, to wit, Armstrong's failure to use the highest degree of care to stop after respondent was in a position of imminent peril"; that "respondent was never in (certain) imminent peril from any source except from appellant's truck"; but that "liability is predicated not upon a failure of appellant's truck driver to keep a lookout or to discover respondent in imminent peril but upon his failure to timely act upon what he could have seen by keeping a lookout after respondent became in a position of imminent peril." Respondent also argues that "the question of the discovery or discoverability of respondent's imminent peril was conceded and was at no time a live issue in the trial of this cause"; and that "if the appellant thought such instruction was confusing or misleading, then it was his duty to offer a clarifying instruction. Hooper v. Conrad, 364 Mo.Sup. 176, 260 S.W.2d 496, 501." These arguments do not meet the issue presented.

The instruction was not subject to clarification by another instruction, since it was based upon an erroneous theory as to the law of the case. Further, it is clear from the record that whether or not defendant's driver could have discovered plaintiff's imminent peril in time to stop was a live issue in the case, defendant's truck driver having testified that he applied all brakes on his truck and trailer the instant plaintiff crossed the center line and the truck could not be stopped short of collision with plaintiff's car. The issue of time to stop after plaintiff came into a position of dis-

coverable peril was also submitted by defendant's instructions. Plaintiff's instruction no. 1 was not only erroneous, but was prejudicial and the giving of it was prejudicial error. Toburen v. Carter, supra; Welcome v. Braun, supra; Creech v. Blackwell, Mo.Sup., 298 S.W.2d 394, 402.

It is unnecessary to discuss the instruction further, since it will have to be redrafted in the event of another trial and other criticism of the instruction may be avoided. It is also unnecessary to consider other assignments of error.

The judgment is reversed and the cause remanded.

All concur.